## IN THE MATTER OF THE ARBITRATION BETWEEN

**THE FIRST BAPTIST
CHURCH OF GLENARDEN**

    **Claimant / Counter-Respondent**

**AND**

**NEW MARKET METALCRAFT, INC.**

    **Respondent / Counter-Claimant**

\* \* \* \* \* \* \*

Before

**Kenneth K. Sorteberg, Esquire
Arbitrator**

**In accordance with the rules of the
American Arbitration Association,
Construction Industry Arbitration Rules**

\* \* \* \* \* \* \*

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the parties dated May 28, 2004,[1] and having been duly sworn and having duly heard the proofs and allegations of the parties hereby AWARDS as follows:

### The Parties, the Project and the Contract

In this case, a construction contract (the "Contract") dated May 28, 2004, with an original contract sum of $867,530.00, was entered into by and between The First Baptist Church of

---

[1] The parties' agreement to arbitrate is set forth at paragraph 20.2 of their Contract, which provides in pertinent part as follows:

> The laws of the State of Maryland shall govern the interpretation, construction, and enforcement of this Agreement, the Contract Documents, and all transactions and agreements contemplated hereby, notwithstanding any state's choice of law rules to the contrary. All parties recognize that conflicts or disputes may occasionally arise. If any dispute cannot be resolved in private meetings, the parties agree, as an alternative to litigation, to enter mediation and, if mediation is unsuccessful, legally binding arbitration in accordance with the rules of the American Arbitration Association, Construction Industry Arbitration Rules. Any demand for arbitration shall be filed by serving such demand on the parties listed in Article 18 above, and shall not be filed with the American Arbitration Association. The parties agree to select an arbitrator by mutual agreement, however, should the parties be unable to agree on an arbitrator, then each party shall select one neutral third party, who will choose the arbitrator for the parties. The parties agree that any arbitration award may be entered in any court having jurisdiction over the subject matter or parties. The parties understand that these methods shall be the sole remedy for any controversy or claim arising out of this Agreement or the subject matter hereof, and expressly waive their right to file a lawsuit or claim against one another for such disputes, except to enforce an arbitration decision. This provision shall survive termination of this Agreement.

The parties had satisfied the mediation requirement of paragraph 20.2 prior to this arbitration.



Glenarden (the "Church") as the owner/general contractor and New Market MetalCraft, Inc. ("New Market") as the miscellaneous metals contractor, for certain miscellaneous metals work on a brand new, approximately $50 million church facility project being constructed by the Church. See FB Vol. 1, and NM Vol.1.[2] This new church facility is known as the New Worship Center, Phase I (the "Project"), located at 610 Watkins Park Drive, Kettering, Maryland 20774. New Market's work under the Contract included, among other things, an extensive catwalk system high in the ceiling of the new sanctuary, stairs, and railings. Disputes arose between the parties on the Project, and by letter dated April 17, 2006, the Church terminated the Contract for default.

The parties have stipulated that the original contract sum of $867,530.00 was increased by approved/stipulated change orders, including additions and deletions to the contract sum, totaling $430,620.00, bringing the undisputed adjusted contract sum to $1,298,150.00. The parties have also stipulated that the Church has paid New Market a total of $630,967.00, leaving an undisputed contract balance remaining of at least $667,183. The aforesaid approved/stipulated change orders are summarized as follows:

| CO # | Original Contract Sum | $867,530 |
|---|---|---|
|  | **Approved/Stipulated Change Orders:** |  |
| 1 | Grand Stair Tube Stringer | 6,430 |
| 2 | Delete Galvanizing, Credit | (1,500) |
| 3 | Bronze/Glass Rails | 428,000 |
| 4 | Delete 120 ft. of Catwalk, Credit | (20,500) |
| 5 | North and West Grand Stairs | 14,822 |
| 6 | Choir Stairs 1 and 2 | 20,884 |
| 7 | Removable Grating | 2,185 |
| 8 | Changes to Balcony Stairs | 1,940 |
| 9 | Delete Erect Light Grid / Speaker Platforms, Credit | (23,660) |
| 10 | Delete Catwalk X Bracing, Credit | (1,040) |
| 13 | Modify Catwalk Toe Boards | 3,059 |
|  | **Total Approved/Stipulated Change Orders** | **$430,620** |
|  | **Undisputed Adjusted Contract Sum** | **$1,298,150** |
|  | **Less: Amount Paid by the Church to New Market (Stipulated)** | **$630,967** |
|  | **Undisputed Contract Balance Remaining** | **$667,183** |

## The Church's Claims

The Church claims that New Market breached the Contract, that the Church rightfully and properly terminated the Contract for default, and that the Church is entitled to recover as damages therefore the sum of $2,058,375. The Church's claimed damages are summarily calculated as follows:

---

[2] Both the Church and New Market submitted most of their respective exhibits in about 40 numbered bound volumes combined. The Church's exhibit binders will be referred to herein as FB Vol. __, and New Market's exhibit binders will be referred to herein as NM Vol. __.

| Summary Description of Church's Claimed Damages | Amount |
|---|---|
|  |  |
| Completion Costs | $767,388 |
| Plus Administrative Burden 15% | 115,108 |
| Plus Consulting Costs | 97,440 |
| Plus Legal Costs - Default-related | 67,084 |
| Delay Damages          $8,029/day x 113 days |  |
| Includes - Loan Interest          $ 484,660 |  |
| - Staffing Payroll      $ 187,919 |  |
| - General Conditions $ 234,646 | 907,225 |
| Subtotal | $1,954,245 |
| Less: Undisputed Contract Balance Remaining | (667,183) |
| Subtotal | $1,287,062[3] |
| Plus: Arbitration-related Legal and Other Fees, Costs and Expenses | 771,313 |
|  |  |
| Total of Church's Claimed Damages | $2,058,375 |

See FB Vol. VI including the Church's revised "Damage Recap," submitted December 8, 2009 to supplement FB Vol. VI; the Church's May 18, 2009 Demand for Arbitration; the Church's July 9, 2009 Statement of Claims and Damages; and Affidavit in Support of First Baptist Church of Glenarden's Statement of Fees and Costs dated December 22, 2009.

## New Market's Claims

New Market seeks damages under five Counts. Count I is for breach of contract. New Market claims that it is entitled to an increase in the Contract Sum for certain changes to the Contract and extra work performed by New Market prior to the termination of the Contract, that certain approved requisitions were never paid, that the Church wrongfully terminated the Contract, and that New Market is entitled to recover as damages therefore the sum of $487,367, including the aforesaid changes and extra work and taking into account credits for deleted work, plus pre-award and post-award interest. (New Market asserts in the alternative within Count I that, even if the Church rightfully and properly terminated the Contract for default, New Market is entitled under Contract paragraph 16.4 to recover $225,618, before consideration of attorneys' fees and interest.) Count II, for *quantum meruit* and/or unjust enrichment, seeks damages in the same amount as Count I. Count III, for fraud, seeks actual damages in the same amount as Count I, plus punitive/exemplary/statutory damages of at least treble the said actual damages. Count IV, for intentional copyright infringement, seeks damages in the amount of $150,000 as damages for each work allegedly infringed by the Church, under The Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.* Count V, for civil conspiracy, seeks actual damages in the same amount as Count I, plus punitive/exemplary/statutory damages of at least treble the said actual damages. New Market also seeks to recover attorneys' fees and costs with respect to each Count.

New Market's claimed breach of contract damages, excluding interest, are summarily calculated as follows:

---

[3] The Church's revised "Damage Recap," submitted December 8, 2009 to supplement FB Volume VI, shows a corresponding "Total Damage" amount of $1,290,121. The $3,059 difference represents the amount of stipulated Change Order 13, which the Church omitted from its revised "Damage Recap."

3

| Summary Description of New Market's Claimed Damages | Amount |
|---|---|
| Original Contract Sum | $867,530 |
| Plus:  Total Approved/Stipulated Change Orders | 430,620 |
| Plus:  Changed and Extra Work | 112,833 |
| Total Adjusted Contract Price | $1,410,983 |
| Less:  Credits for Deleted Work | 292,649 |
| Less:  Credits for Payments Made by the Church to New Market | 630,967 |
| Subtotal | $487,367 |
| Plus: Arbitration-related Legal and Other Fees, Costs and Expenses | 443,944 |
| Total of New Market's Claimed Damages | $931,311 |

See NM Vol. 25; New Market's May 20, 2009 Demand for Arbitration; New Market's July 9, 2009 Damage Calculation; New Market's August 7, 2009 Statement of Claims and Damages; New Market's December 21, 2009 letter submission including Amended Damages Calculations; and December 21, 2009 Supplemental Attorneys' Fee and Costs Affidavit of Michael Melkersen.

### **Whether the Contract Was Rightfully and Properly Terminated**

The Arbitrator finds that the Church rightfully and properly terminated the Contract for default.

The contract documents, in particular Catwalk Typical Detail 11 ("Detail 11") on contract drawing 4.46,[4] are perfectly clear as to the requirements for the catwalk which New Market was obligated to provide.  The compelling evidence was that New Market failed, in a material and substantial manner, to provide the catwalk in accordance with these requirements, as testified at great length, among others, by Greg Diana, P.E.,[5] by Dale Anthony Fritz, P.E., and by John Kevin Frey, Jr., as well as by Ole Melkersen.[6]  See also project records including

---

[4] Contract drawing 4.46 was stamped and sealed by a Maryland licensed professional engineer on behalf of Datum Engineering Incorporated, the engineering firm of record for the Project.  Contract drawing 4.46 is contained in the front pocket of FB Vol. 5.

[5] By prior order of the Arbitrator, the parties were permitted to take a *de bene esse* deposition Greg Diana, P.E. and to submit into evidence the *de bene esse* deposition transcript of Mr. Diana.  Counsel for both parties participated in this deposition.

[6] Mr. Fritz is the Church's structural engineering consultant, and he has been a registered professional engineer in several states, including Maryland, and Kentucky since 1979.  Mr. Diana was a representative of Datum Engineering, the structural engineer for the Project.  He was personally involved in the Project's design, and he personally inspected New Market's catwalk work on the Project.  Mr. Diana obtained a civil engineering degree from the University of Texas in 2000, and he became a licensed professional engineer in 2007.  Mr. Frey is a certified steel inspector with 15 years experience in that field.  He is the owner of Independent Steel Inspectors, a third party inspector hired by Prince Georges County, Maryland, and he personally performed inspections of New

correspondence, meeting minutes and Mr. Frey's contemporaneous steel inspection reports in FB Vol. 2 and NM Vol. 27; the *de bene esse* deposition transcript, with exhibits 1 through 36, of Greg Diana, P.E.; Fritz expert reports in FB Vol. 4. New Market failed to provide the field welded joist stiffeners required to be installed by New Market as a part of the catwalk system detailed on Detail 11. New Market failed to weld the plates, which connected the tube steel to the joists, as detailed on Detail 11. New Market failed to weld the catwalk hanger angles, which connected the catwalk platform to the tube steel, as detailed on Detail 11. New Market failed to weld the diagonal bracing angles to the hanger angles as detailed on Detail 11. Generally, New Market provided only a fraction of the welding required by Detail 11. New Market's attachment point of the diagonal bracing angles to the hanger angles was higher than detailed on Detail 11. The diagonal bracing angles installed by New Market were only 3x3x1/4, whereas Detail 11 required them to be of much larger sizes because their lengths exceeded the 9'-6" maximum length for 3x3x1/4 angles. New Market's failure to provide the catwalk in accordance with the contract documents, as described above, constituted a breach of contract and an event of default under Contract paragraph 14.13.

Welding. New Market contends that it performed the catwalk welding in accordance with its own approved catwalk shop drawings, which greatly reduce the amount of welding required by Detail 11. The shop drawings deviated significantly from Detail 11 with respect to the amount of welding required on the catwalk. The catwalk shop drawings are contained in FB Vol. 5. New Market contends that it is entitled to re-design and greatly reduce the catwalk welding when it prepares its shop drawings, so long as the welds remain structurally sound. New Market contends that it can do so without express approval of the Church, the Architect or the Engineer. However, the contract documents do not support New Market's contention. New Market submitted into evidence contract documents, including specification Section 05590 - Miscellaneous Metals and specification Section 01330 – Submittal Procedures. NM Vol. 1, FB Vol. 1, NM Vol. 29, tab 41. Section 05590, item 1.03-Submittals, states in pertinent part:

> A. General: Submit the following in accordance with Section 01330.
>
>                             *       *       *
>
> C. Shop Drawings: … .

NM Vol. 1, FB Vol. 1. Thus, the miscellaneous metals shop drawings must be submitted in accordance with Section 01330.[7] Section 01330, at item 1.04-Contractor Responsibilities and item 3.01-Submission Requirements, states in pertinent part:

---

Market's catwalk work. Ole Melkersen, the project manager of New Market, was personally involved in the catwalk work. He has over 50 years experience in welding and miscellaneous metals fabrication and erection work.

[7] New Market contends that the word "Contractor," as used in Section 01330, refers to the Church rather than to New Market, because the Church acted as both the Owner and the General Contractor, contracting directly with all of the various trade contractors, including New Market. The many specification sections must be viewed on a case by case basis in this regard, because in some specification sections the word "Contractor" is associated with duties which the Church can and must perform, while in others it is associated with duties which the trade contractors can and must perform. In Section 01330, the word "Contractor" refers to New Market, because Section 05590 expressly requires New Market to submit its shop drawings "in accordance with Section 01330" and because Section 01330 deals with procedures for the submittals, including shop drawings, which New Market is obligated to prepare and submit.

1.04-CONTRACTOR RESPONSIBILITIES
*     *     *

D. Contractor's responsibility for errors and omissions in submittals is not relieved by Architect's review of submittals.

E. Contractor's responsibility for deviations in submittals from requirements of Contract Documents is not relieved by Architect's review of submittals, unless Architect gives written acceptance of specific deviations.

F. Notify Architect, in writing at time of submission, of deviations in submittals from requirements of Contract Documents. Include written explanation for the deviation.

*     *     *

3.01-SUBMISSION REQUIREMENTS
*     *     *

E. Accompany submittals with transmittal letter containing:
*     *     *

6. Notification of deviations from Contract Documents.

NM Vol. 1, FB Vol. 1, NM Vol. 29, tab 41. New Market never notified the Architect, in writing at time of submission, of deviations in submittals from requirements of Contract Documents or provided the Architect with a written explanation of the deviations relating to the reduced welding, as required by Section 01330. Nor did New Market ever obtain from the Architect written acceptance of specific deviations, as required by Section 01330. In light of the foregoing, New Market had no right to deviate from the clear welding requirements of Detail 11, and by installing catwalk welding which significantly and materially deviated from these requirements, New Market breached the contract and was in default.

Diagonal bracing. New Market's shop drawings showed the properly sized diagonal bracing attaching to the catwalk hanger angle as shown on Detail 11. However, the diagonal bracing actually installed by New Market was significantly undersized and attached at a much higher point on the hangers, deviating both from the shop drawings and from the contract documents. New Market had no right to deviate from the diagonal bracing size and attachment point requirements of Detail 11, and by installing diagonal bracing which significantly and materially deviated from these requirements, New Market breached the contract and was in default.[8]

Joist stiffeners. New Market completely failed to install the joist stiffeners and refused to do so without additional compensation. New Market argues that the joist stiffeners were not a part of its scope of work. The Arbitrator disagrees. The Contract requires New Market "to furnish and

---

[8] Another issue relating to the diagonal bracing was the angle of attachment, which was shown on Detail 11 and on New Market's shop drawings to be between 30° and 60°. Only some of the diagonal bracing was attached by New Market at the required angle. New Market argued that the design was defective in this regard because it was impossible to meet this requirement, due to the fixed locations of the existing joists. However, the Arbitrator finds that the diagonal bracing could be attached on either side of the catwalk, but that New Market provided analysis with respect to only one side of the catwalk. Thus, New Market failed to prove the design defect. In any event, the Church appeared to have waived this deficiency, and the evidence showed that the Church would have been willing to accept New Market's angle of attachment if the diagonal bracing otherwise had been installed properly with respect to size, weld and attachment point.

install the complete Miscellaneous metals scope of work," which undisputedly includes the catwalk as designed on Detail 11, among other contract documents.  See, e.g., Contract Schedule A-Scope of Work, and see New Market's Scope of Work dated October 8, 2004, incorporated into the Contract at Article 17, item 8-b, which specifically includes the "Steel Catwalk" as shown on contract drawing "4.46."  The joist stiffeners were not specifically excluded under any exclusion listed in the Contract.  Detail 11 clearly shows the joist stiffeners, which are indicated to be field welded.  The Arbitrator finds that the joist stiffeners constitute miscellaneous metal work and are an integral part of the catwalk system to be provided by New Market.  New Market also argues that a deal was struck whereby the Church's separate joist supplier would pre-install the joist stiffeners on the joists.  The Arbitrator finds that there was no change order or other agreement whereby the Church agreed to delete the joist stiffeners from New Market's scope of work.  New Market had no right to omit the joist stiffeners, and by failing and refusing to install them, New Market breached the contract and was in default.

Economic Waste.  New Market argued that the catwalk system installed by New Market, even with all of its deviations from the contract requirements, was structurally sound and that it would be economic waste to require full compliance with the contract requirements.  The Arbitrator disagrees.  New Market presented structural engineering analysis in the arbitration to show that the catwalk system, as installed by New Market, was many, many times stronger than the minimum requirements of sound engineering design practice for the location of the Project.  Even assuming, without deciding, that New Market's catwalk was structurally sound and that the catwalk design went far beyond the minimal structural requirements, the Arbitrator finds that New Market was not excused from installing the catwalk in accordance with the contract requirements.  First, the Church, and its design team, were entitled to design the catwalk as they deemed appropriate.  The evidence showed that the aggressive design was intended to address the Church's concern about the catwalk swaying and making noise to disrupt the ceremonies and events taking place in the very large worship sanctuary directly below the catwalk.   The evidence, in particular a video presented by the Church, showed that the catwalk as built by New Market was susceptible to unacceptable swaying and that the swaying caused an unaccepable loud rattling noise.  Second, and very importantly, the Contract provides a procedure for New Market to request, during the submittal process, approval for deviations from contract requirements.   As explained above, specification section 01330, item 1.04-F, provides as follows:

> F. Notify Architect, in writing at time of submission, of deviations in submittals from requirements of Contract Documents.  Include written explanation for the deviation.

Section 01330, item 1.04-E, provides that deviations in submittals are allowed so long as the Architect provides written acceptance of specific deviations.  Thus, the time for New Market to have provided its engineering analysis was during the submittal process, as part of its "written explanation for deviation" under section 01330, item 1.04-F.  However, New Market did not avail itself of this procedure during the submittal process and instead proceeded to install the non-compliant catwalk without any approval for the deviations.  Even after being declared in default in March 2006, New Market's attempts to have the deviations accepted were based simply on Ole Melkersen's bald statement that New Market's catwalk was structurally sound.  Ole Melkersen is not a structural engineer, and New Market did not have a structural engineer on its staff.  Nor did New Market hire a structural engineer prior the termination to support its

position. The Contract places on New Market the burden to explain deviations and to obtain the Architect's acceptance of them. New Market failed in both respects.

Waiver. New Market argues that the Church waived the default regarding wrong sized diagonal braces by not giving notice in writing within seven days after the Church learned of the default, as required by Contract paragraph 14.13. The Arbitrator finds that the Church did not waive this default. First, the diagonal bracing size deviation was discovered by Mr. Frey of Independent Steel Inspection during a February 21, 2006 inspection. FB Vol. 2, tab 29. Seven days later, on February 28, 2006, Mr. Frey met with the Church and with New Market to go over this, and other, deviations on the catwalk. FB Vol.2, tab 28. Thus, New Market was placed on actual notice of the default regarding wrong sized diagonal braces.[9] The Arbitrator finds that such actual notice is sufficient to satisfy the contractual notice requirement. Second, even if the Church's notice had not been timely, there was no prejudice to New Market, and so a strict application of the seven day notice requirement would be inequitable to the Church, essentially allowing New Market to get away with substantial deviations with respect to the catwalk. Third, New Market's argument is undermined by Ole Melkersen's testimony that the undersized 3x3x1/4 braces were intended to be temporary and were hurriedly installed to make the catwalk safe when New Market was required to vacate the sanctuary in December 2005 to make way for the installation of the extensive scaffolding platform. Thus, New Market knew all along that the diagonal bracing was undersized and non-compliant. New Market would thus be estopped from asserting a waiver defense based upon lack of notice of the non-compliant diagonal bracing.

Estoppel/substantial performance/unjust enrichment/immateriality. New Market argues that it has substantially performed the required catwalk work, and so the Church is estopped from demanding strict compliance in order to prevent unjust enrichment. This argument fails because the catwalk was far from substantially performed, and the deviations were material, as evidenced by the corrective work which cost in excess of $100,000. The Church was not unjustly enriched, as the Church did not receive from New Market the catwalk which it had contracted for and the Church had to spend over $100,000 for another contractor to correct and complete the catwalk.

Accord and satisfaction. New Market argues that a February 28, 2006 meeting resulted in an accord and satisfaction which permitted New Market to avoid replacing the undersized diagonal bracing with the proper sized bracing. This is based on a statement in the Church's February 28, 2006 letter to New Market that "[t]he welding issue was the only issue not resolved by the end of the meeting." NM Vol. 28, tab 12. According to New Market, this statement implies that the diagonal bracing issue was resolved. New Market interprets "resolved" to mean that it can avoid replacing the undersized diagonal bracing with the proper sized bracing. However, the letter does not say that, and the word "resolved" can mean many things. A March 1, 2006 letter from the Church to New Market sheds light on how the diagonal bracing issue was "resolved," as it states, "in regard to the catwalk knee bracing [i.e., diagonal bracing], I understand you want to submit this modification to the A/E for approval. You may submit to us a Request for Change but until approval is received you must continue to make corrections to the catwalk to fulfill the contract drawings and specifications." FB Vol 1, tab 40. Thus, the Arbitrator finds that "resolved" meant simply that New Market could try to get the Architect or Engineer to approve

---

[9] The Church received Mr. Frey's written notes detailing the deviations on March 9, 2006 and forwarded them to New Market on March 10, 2006. FB Vol.2, tab 28. Again, the Church acted promptly.

the undersized diagonal bracing, but that correction must proceed until approval was received. In light of the foregoing, there was no accord and satisfaction as alleged by New Market.

New Market's Failure to Cure.  After being notified of the many catwalk deficiencies throughout March 2006, and after being declared in default and directed to correct the deficiencies on March 27, 2006 (see FB Vol. 2, Tab 31), New Market made virtually no effort to correct the catwalk deficiencies despite being given a generous amount of time in which to cure the default.  New Market performed a small amount of additional welding in April 2006, but stopped to wait for approval/acceptance of what it had done.  However, as stated above, Detail 11 was perfectly clear as to the catwalk welding and other requirements, and New Market's project manager, Ole Melkersen, had decades of experience in welding and reading miscellaneous metals design drawings.  There was absolutely no reason New Market could not have completed the welding and other deficiencies in accordance with Detail 11 of the contract documents, as demanded by the Church.

Rather than correcting the many catwalk deviations, New Market took the position that the joist stiffeners were not in its scope of work and installation of them would cost extra; New Market took the position that its welding was adequate and additional welding would cost extra; New Market attempted without success to have the Church accept a credit for leaving the undersized 3x3x1/4 diagonal bracing in place; New Market attempted without success to have the Architect and/or the Engineer accept the deviations and/or alternative methods of correction; New Market took the position that it needed the engineer's approval of its few corrective welds; New Market took the position that Detail 11 was subject to interpretation and required the engineer's clarification; and New Market continued to maintain a very small crew of but one or two, occasionally three, men on the Project.  The Arbitrator finds that none of these positions and actions by New Market were reasonable and none of them excused New Market's failure to proceed diligently and promptly to correct the many catwalk deficiencies as repeatedly directed by the Church before and after being declared in default.  While the Church permitted New Market to seek approval of the deviations or alternative correction methods from the Architect and/or Engineer before and after being declared in default, the Church consistently and adamantly insisted that New Market proceed to correct the deviations in accordance with the contract documents until such time as the Architect's and/or Engineer's approval was obtained. No such approval was ever obtained by New Market.  New Market's failure to proceed diligently and promptly to correct the many catwalk deficiencies after being declared in default, constituted a further breach of the Contract and a default under the Contract.

Termination.  As of April 17, 2006, the catwalk remained in virtually the same condition as it was on March 27, 2006.  New Market's inaction constituted a virtually complete failure to cure the default weeks after being notified thereof.  The Church thus had the right, under Contract paragraph 14.13, to terminate the Contract for cause under paragraph 16.3:

> 14.13  Default.  If the Contractor should at any time:
>
> (1)  fail to supply the labor, materials, equipment, supervision, and other things required of it in sufficient quantities and of sufficient quality to perform the Work with skill, conformity, promptness, and diligence required hereunder;
> (2)  cause stoppage or delay or interference with the Work;

9

(3)  become involvent;

(4)  fail in the performance or observance of any of the covenants, conditions, or other terms of this Agreement; or

(5)  file bankruptcy, either voluntary or involuntary;

then in an such event, each of which shall constitute a default hereunder by the Contractor, the Owner shall, after giving the Contractor notice of default and 48 hours within which to cure, have the right to exercise any one or more of the following remedies without waiving any other rights at law or equity that the Owner may have to recoup damages, expenses, and costs in having to complete the Work:

(1)  require that the Contractor utilize, at its own expense, overtime labor and additional shifts as necessary to overcome the consequences of any delay attributable to the Contractor's default;

(2)  remedy the default by whatever means the Owner may deem necessary or appropriate including, but not limited to, correcting, furnishing, performing, or otherwise completing the Work, or any part thereof, by itself or through third parties (utilizing where appropriate any materials and equipment previously purchased for that purpose by the Contractor) and deducting the cost thereof (plus an allowance for administrative burden equal to 15% of such costs) from any monies due or to become due to Contractor hereunder.  All costs associated with the warranting of the work performed by others will be borne at the expense of the Contractor;

(3)  terminate the Contractor for cause in accordance with Section 16.3 of this Agreement, without thereby waiving or releasing any rights or remedies against Contractor or its sureties.  Owner may also at any time file this Contract as a financing statement under applicable law; and

(4)  recover from Contractor all losses, damages, penalties, and fines, whether actual or liquidated, direct or consequential, and all attorney's fees or costs suffered by Owner by reason of or as a result of Contractor's default (whether or not Contractor is terminated for such default).

The foregoing remedies shall be considered separate and cumulative, and shall be in addition to every other remedy given hereunder or under the Contract Documents, or now or hereafter existing in law or equity.

*     *     *

16.3  <u>Termination for Cause.</u>  At any time, the Owner may terminate this Agreement upon seven days advance notice in writing [deletion omitted], or for cause.  Cause [deletion omitted] shall be defined to mean the events listed in Section 14.13 of this Agreement. [Deletion omitted.]

FB Vol. 1, and NM Vol.1.  By letter dated and delivered to New Market on April 17, 2006, the Church issued to New Market a "Notice of Termination for Default," which by its terms became

effective seven days thereafter, in accordance with Contract paragraph 16.3. FB Vol. 2, Tab 59. The Arbitrator finds that the Church properly and rightfully terminated the Contract for default.[10]

## The Church's Damages for New Market's Default and the Termination of the Contract

The Church is entitled to recover, as damages arising out of New Market's default and the termination of the Contract, the Church's costs (and in some cases the reasonable value of the work required) to complete and correct New Market's work, less the contract balance remaining at the time of termination.[11]

The Church claims that its total completion costs are $1,047,020, including $767,388 in direct construction costs (including in some cases the reasonable value of completing the work), a 15% administrative burden of $115,108, consulting costs of $97,440 and legal costs of $67,084. See FB Vol. VI including the Church's revised "Damage Recap," submitted December 8, 2009 to supplement FB Vol. VI. The Arbitrator finds that the Church failed to prove that it was entitled to the full $1,047,020 claimed by the Church. The Arbitrator finds that the Church's total completion costs (including in some cases the reasonable value of completing the work) to be $821,778, as calculated below:

| Item | Description of the Church's Claims for Completion Work | Cost |
|------|--------------------------------------------------------|------|
|      |                                                        |      |
| 1    | Catwalk corrections and completion                     | $129,800 |
| 2    | Elevator sump pit covers                               | 2,000 |
| 3    | Glass & Bronze at Grand Stairs and 2nd floor mezzanines | 160,000 |
| 4    | Bronze railings at sanctuary tiered seating and entryways | 206,000 |

---

[10] New Market argues that the Church's termination was wrongful because it never obtained the Architect's certification required for a termination under General Conditions Article 14. However, as explained below, the Contract provides multiple independent options for the Church to terminate the Contract for default. The Church elected to terminate the Contract under Contract paragraphs 14.13 and 16.3, rather than under General Conditions Article 14. These Contract paragraphs do not require an Architect's certification. Be that as it may, the Architect's engineering consultant who designed the catwalk system, Datum Engineering, as well as the independent steel inspector, Mr. Frey, both provided statements prior to termination that the catwalk work was defective, and Datum Engineering further required New Market's defective catwalk work to be performed in accordance with the contract documents. The Arbitrator finds that these statements were sufficient to satisfy the Architect's certification requirement, had the termination been under General Conditions Article 14.

[11] New Market argues that, even if the Church had rightfully and properly terminated the Contract, New Market is entitled to recover $225,618 pursuant to a formula set forth in Contract paragraph 16.4. However, this formula would have applied only if the Church had terminated the Contract for cause under Article 14 of the General Conditions. Contract paragraph 16.4 states in pertinent part as follows:

> 16.4   Payment following Termination for Cause. If the Contract is terminated by the
> Owner for cause *as provided in Article 14 of the General Conditions*, the Owner shall pay
> the Contractor an amount calculated as follows: ... [Formula omitted.] [Italics supplied.]

Here, the Church's April 17, 2006 termination letter (FB Vol. 2, Tab 59) does not base the termination on Article 14 of the General Conditions. On the contrary, the termination is expressly based on Contract paragraphs 14.13(3) and 16.3, which provide a completely independent contractual basis for termination. (Contract paragraphs 14.13 and 16.3 are quoted previously in this Award.) The Contract provides the Church with multiple options for terminating the Contract. In fact, Contract paragraph 14.13(4) states, "The foregoing remedies shall be considered separate and cumulative, and shall be in addition to every other remedy given hereunder or under the Contract Documents, or now or hereafter existing in law or equity." Since the Church opted not to proceed under Article 14 of the General Conditions, the Church is not bound by the formula set forth in Contract paragraph 16.4.

| 5 | Loading dock area hand and guard rails | 6,660 |
|---|---|---|
| 6 | Railings in 2nd floor hallways at ramps | 1,277 |
| 7 | Railings at choir stairs | 4,131 |
| 8 | Sanctuary cross | 3,600 |
| 9 | Narthex cross | 3,400 |
| 10 | Aluminum ships ladder to tension grid | 3,200 |
| 11 | Repair handrails installed by NMMC incorrectly at Stairs 1,3,8,10 | 0 |
| 12 | Tower ladders and platforms | 8,171 |
| 13 | Balance of handrails at Stairs 1 – 14 | 29,675 |
| 14 | Catwalk Access stairs | 41,582 |
| 15 | Balance of stairs to tiered seating | 21,915 |
| 16 | Ships ladder to 3 roof hatches, skybox and tower levels | 4,442 |
| 17 | Ornamental railings at pulpit | 21,600 |
| 18 | Gates at roof access stairs | 0 |
| 19 | A/V cable trench covers New Market/the Church | 0 |
| 20 | Welding of Tower Cross | 833 |
| 21 | Folding Partition Supports | 1920 |
| 22 | Corrective Work to Balcony Stairs | 0 |
| 23 | Drywall Repairs Due to Corrective Work @ Catwalk-CO#59 | 0 |
| 24 | Ceiling Grid Repairs Due to Corrective Work @ Catwalk-CO#063 | 0 |
| 25 | Repair Grid in Sanctuary @ Catwalk Corrective Work – CO#67 | 0 |
| 26 | Remove Broken Pipe in Sanctuary Ceiling & Reinstall Due to Catwalk Corrective Work – CO#024 | 0 |
| 27 | Inspections & Testing | 0 |
| 28 | Sliding Door Header | 5,000 |
| 29 | Projection Screen Bracket | 1,000 |
| | Sub Total | $656,256 |
| | 15% Administrative Burden[12] | 98,438 |
| | Consulting Cost during Re-let (Delta Consulting)[13] | 0 |
| | Attorneys' Fees and Costs Arising from Default and Termination[14] | 67,084 |
| | Total | $821,778 |

The Church itemized 29 individual claim items of direct construction cost (and in some cases the reasonable value of the work) required to complete New Market's work.  See chart directly above, and see FB Vol. VI including the Church's revised "Damage Recap," submitted December 8, 2009 to supplement FB Vol. VI. With respect to items 1, 2, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 20, 28 and 29, the evidence supported both the Church's entitlement to recover for the claim item and the amount of damages claimed by the Church.  With respect to item 19, the

---

[12]  Pursuant to Contract paragraph 14.13, the Church is allowed to add "an allowance for administrative burden equal to 15%."

[13]  Delta Consulting Group Inc.'s charges for April through July 2006 are for re-letting New Market's work and for developing a new project schedule for the Church's use in managing the entire project to completion.  Delta Consulting's schedule-related efforts are not chargeable to New Market.  In any event, the Arbitrator finds that both the scheduling efforts and the re-letting efforts constitute administrative functions.  The Arbitrator finds that the 15% administrative burden allowed by Contract paragraph 14.13 is intended to cover all administrative costs, whether the administration function is performed by the Church's personnel or by its consultants.

[14]  Pursuant to Contract paragraph 14.13, the Church is allowed to recover "all attorney's fees or costs suffered by Owner by reason of or as a result of Contractor's default (whether or not Contractor is terminated for such default)."  Invoices for attorneys' fees and costs incurred from February through August 2006 as a result of New Market's default and termination, totaling $67,084, are found at FB Vol. 6, tab 195.

Church claims no damages. With respect to the remaining claim items, as explained below, either the Church failed to prove that it was entitled to recover for the claim item, or the Church proved its entitlement to the claim item but was not able to prove the full amount of damages claimed.

Items 8 and 9. Under items 8 and 9, the Church claims $12,200 for providing the Sanctuary Cross and $23,500 for providing the Narthex Cross. The Arbitrator believes Ole Melkersen's testimony that these charges are based upon drastically modified designs for these two crosses, that New Market's scope of work was based upon a much simpler design; that a reasonable credit for the Sanctuary Cross is $3,600; and that a reasonable credit for the Narthex Cross is $3,400. See also NM Vol.25 A, "FBCG vs. NMMC Cost to Complete" summary and tab 10. Thus, the Church is entitled to recover $3,600 for the Sanctuary Cross (item 8) and $3,400 for the Narthex Cross (item 9).

Item 10. The Church claims $3,700 under item 10 for providing aluminum ship's ladder to tension grid. However, the Walton's Welding, Inc. estimate, submitted into evidence by the Church, shows a price of $3,200. FB Vol. 6, tab 178. Thus, the Church is entitled to recover $3,200.

Item 11. The Church claims $1,988 under item 11 for repairing incorrectly installed handrails at stairs 1, 3, 8 and 10. These handrails were installed by Mountain View Metals LLC after New Market's Contract was terminated, and Mountain View billed this work 100% complete on February 14, 2007. See FB Vol. 6, tab 181, and NM Vol. 28, tab 3. The repair work was performed by Walton's Welding, Inc., which submitted its invoice for this repair work on April 20, 2007. See FB Vol. 6, tab 178, and NM Vol. 28, tab 3. The Arbitrator finds that Mountain View, not New Market, incorrectly installed handrails at stairs 1, 3, 8 and 10. Thus, the Church failed to prove that New Market was responsible for or liable for this repair work, and so this claim item is denied.

Item 12. The Church claims $38,660 under item 12 for the labor and equipment to install the tower ladders and platforms, based on charges by Mountain View Metals, LLC for this installation. New Market had already fabricated and furnished to the Project all of the materials, including six platforms with grating and rails attached, seven cage ladders and a ship's ladder. Ole Melkersen testified that New Market had also already installed a temporary aluminum tube beam to be used for hoisting these materials into place in the tower. Ole Melkersen further testified, convincingly, that Mountain View's $38,660 price for the installation was very unreasonable, that the installation of the tower ladders and platforms required only very simple means and methods, and that a two man crew (at $120/hour for the crew) would be able to perform the installation in seven 8-hour days, with the assistance of a welding machine (at $175/week) and a hoist (at $100/week). Mr. Melkersen convincingly described the very simple installation means and methods. The Arbitrator believes and accepts the testimony of Mr. Melkersen. The Arbitrator finds Mountain View's $36,660 charge for the installation to be unreasonable. The Arbitrator finds the reasonable value of this work to be $8,171 (i.e., 7 days x 8 hours/day x $120/crew-hours = $6,720 for the crew; plus $175/week x 1.4 weeks = $245 for a welding machine; plus $100/week x 1.4 weeks = $140 for a hoist; plus contractor's overhead and profit markup of 15% x $7,105 = $1,066). Thus, the Church is entitled to recover $8,171 for the tower ladders and platforms.

<u>Item 18.</u> The Church claims $3,478 under item 18 for gates at roof access stairs. As testified by Ole Melkersen and admitted by Mr. Overbey, the addition of these gates was required to address a design problem, and so New Market was not responsible for performing this work. Accordingly, this claim item is denied.

<u>Item 21.</u> The Church claims $10,766 under item 21 for providing folding partition supports. The Arbitrator believes Ole Melkersen's testimony that most of the folding partition work was completed by New Market, that the incomplete work was due to obstacles preventing the work (see NM Vol. 29, tabs 48 and 56), that New Market's materials to complete the work had been delivered to the site, that work being charged to New Market constitutes modifications to the original design, and that $1,920 was the reasonable value of the remaining work which New Market was prevented from completing (see NM Vol. 25A). Thus, the Church is entitled to recover $1,920.

<u>Item 22.</u> The Church claims $3,712 under item 22 for corrective work at balcony stairs. The Arbitrator believes the testimony of Ole Melkersen that there was nothing wrong with the stairs and that the corrective work was required to address a dimensional variance between the design and as-built condition of the top of concrete on the sanctuary platform. This dimensional variance was caused by another contractor. New Market brought this variance to the Church's attention in December 2005, but the Church took no corrective action as long as New Market was working on the Project. See NM Vol. 25A, tab 18, and NM Vol. 29, tab 27. Accordingly, this claim item is denied.

<u>Items 23, 24, 25 and 26.</u> The Church claims $549, $1,681, $3,949 and $6,029, respectively, under claim items 22, 23, 24 and 25 for repairs to drywall, ceiling grid, and pipe. All of this damage occurred after New Market's contract was terminated, and it was caused by other contractors while completing New Market's work. None of this damage was caused by New Market. Gilbert Jerry Overbey, the Church's project manager who testified with respect to the Church's direct construction costs for completion of New Market's work, could not state with any specificity where the damage occurred, how it was caused, and the extent of damage. The Church failed to prove that New Market was responsible for or liable for this damage, and so these four claim items are denied.

<u>Item 27.</u> The Church claims $21,263 for inspections and testing, based upon invoices from Geolab. See FB Vol. 6, tab 193(b). A careful review of the Geolab invoices for this work shows that only two charges on the invoices can possibly be related to testing and inspection of miscellaneous metals work. All of the other charges relate to testing and inspection of soils, asphalt, concrete and concrete reinforcing steel. The two possibly related charges (dated May 30, 2006 and June 22, 2006) indicate they are for "Structural Steel Inspection." Mr. Overbey did not testify with any personal knowledge regarding whether these two <u>structural steel</u> inspection charges were actually related to correction or completion of New Market's <u>miscellaneous metals</u> work. No one from Geolab testified in the arbitration. The Church failed to prove that any of the Geolab charges are recoverable from New Market, and so this claim item is denied.

<u>Adjustments to the contract balance remaining.</u> The parties agree that at least $667,183 remained in the contract at the time of termination. New Market contends that this amount should be increased by $112,833 for eleven items of changed and extra work performed by New Market prior to the termination of the Contract, for which no change orders were issued. See

14

NM Vol. 25 and NM Vol. 25A, and see New Market's December 21, 2009 letter submission including Amended Damages Calculations. The Arbitrator finds that New Market is entitled to an increase in the contract sum in the amount of $24,077, calculated as follows, which brings the remaining contract balance up to $691,260:

| Item # | Description of New Market Claims for Changed/Extra Work | Amount |
|---|---|---|
| | Undisputed Contract Balance Remaining | $667,183 |
| 1 | CN #02 Reviewing Design Drawings | 0 |
| 2 | CN #14 Modify Catwalk at Truss Columns | 2,783 |
| 3 | CN #16 Outer Leg A & B Fit into Bulkhead | 5,566 |
| 4 | CN #17 Main Speaker Platform Towers | 0 |
| 5 | CN #19 Platform at Seq. 7 | 2,132 |
| 6 | CN #   Electrical Box Inefficiencies | 0 |
| 7 | CN #   Electrical Box Removal | 5,382 |
| 8 | CN #   Lighting Inefficiency | 0 |
| 9 | CN #   Material Handling Inefficiency | 0 |
| 10 | CN #   Lighting Safety Engineer | 0 |
| 11 | CN #11 Uneven Truss Elevation | 8,214 |
| | Increase in Contract Balance for Changed and Extra Work | $24,077 |
| | Adjusted Contract Balance Remaining | $691,260 |

With respect to items 2, 3, 5, 7 and 11, the evidence supported both New Market's entitlement to recover for the extra work items performed by New Market and the amount of damages claimed by New Market. With respect to the remaining extra work items, as explained below, either New Market failed to prove that it was entitled to recover for the item, or New Market proved its entitlement to the item but was not able to prove the amount of damages claimed.

Item 1. With respect to item 1, the Arbitrator finds that New Market is not entitled to recover separately for reviewing revisions to contract drawings, despite the fact that the revisions were not clouded or otherwise called out. The contractual allowance of 15% for New Market's overhead and profit on changes to the work was intended to compensate New Market for all overhead, including drawing review, relating to any changes arising out of design revisions.

Item 4. With respect to item 4, the Arbitrator finds that New Market is not entitled to recover for main speaker platform towers, because New Market did not prove that it had actually purchased and fabricated these materials and delivered these materials to the Project. New Market had simply submitted cost proposals to the Church from December 15, 2005 through the April 17, 2006 date of termination, to which the Church never responded. See Vol. 25, tab 3-A.

Item 6. With respect to item 6, the Arbitrator finds that New Market is not entitled to recover for electrical box inefficiencies. New Market could have, and ultimately did, solve the problem by simply removing the electrical boxes, for which credit is given in item 7. Moreover, New

Market failed to prove the impact of the electrical boxes on its productivity by any measured mile or other such established methodology or by expert analysis.

Item 8.  With respect to item 8, the Arbitrator finds that New Market is not entitled to recover for lighting inefficiencies.  While the Arbitrator agrees that the lighting was not ideal, the Maryland Occupational Safety & Health ("MOSH") inspector summoned to the Project by New Market did not issue the Project or the Church any citations for violating lighting safety regulations.  The Arbitrator finds this fact to be conclusive on the lighting issue.  The Church did upon request provide New Market with additional portable lighting.  New Market could have, and ultimately did, provide its own supplemental lighting, e.g., by providing its workmen with miner's helments with headlights.  New Market could easily and inexpensively have provided additional portable lighting, especially considering that New Market's crew was working in one location at a time.  Moreover, New Market failed to prove the impact of the lighting on its productivity by any measured mile or other such established methodology or by expert analysis.

Item 9.  With respect to item 9, the Arbitrator finds that New Market is not entitled to recover for material handling inefficiencies, which encompasses any claims relating to lack of access.  New Market was obligated to transport its materials into the building, and the Contract does not promise perfect conditions at all times.  While the Arbitrator agrees with New Market that the conditions on this construction site were more difficult than average, and that the Church as the owner was less helpful than the average owner, the conditions were not unreasonably difficult or beyond industry standards.  Moreover, New Market failed to prove the impact of the material handling problems on its productivity by any measured mile or other such established methodology or by expert analysis

Item 10.  With respect to item 10, the Arbitrator finds that New Market is not entitled to recover for the costs of its lighting safety engineer, Anthony V. Colicchio, P.E. of Anco Engineering.  Although Mr. Colicchio is certified as a safety inspector by the U.S. Army Corps of Engineers, he has very limited experience in the field of "lighting safety," and his findings on the Project carry little weight.  The Arbitrator accepts as conclusive on the lighting issue the fact that the MOSH inspector, who was summoned to the Project by New Market, did not issue the Project or the Church any citations for violating lighting safety regulations.  Moreover, to the extent Mr. Colicchio's findings were intended to support of item 8 regarding lighting inefficiencies, the costs for Mr. Colicchio must be denied just as item 8 was denied.

Thus, the Church's net damages are the $821,778 total completion costs minus the adjusted contract balance remaining of $691,260, which leaves $130,518 as the amount which the Church is entitled to recover under the Contract for completing and correcting New Market's work and as a result of New Market's default and the termination of the Contract.

## The Church's Delay Claim

The Church also claims delay damages of $907,227 for 113 days of critical path delay which the Church attributes to New Market.  This claim is denied.

Contract Does not Allow the Church to Charge for Delay.  Contract paragraph 4.3 provides as follows with respect to New Market's liability for delay damages:

4.3    Failure to Complete the Work on Time.  It is mutually agreed by and between the parties that time is an essential part of this contract and that in case the Contractor fails to complete his contract within the time specified and agreed upon, the Owner will be damaged thereby; but because the amount of damages, inclusive of expenses for inspection, superintendence, and necessary traveling expenses, may be difficult if not impossible to definitively ascertain and prove, *it is hereby agreed that the amount of such damages shall be the appropriate sum set forth below in the attached Schedule C, The Schedule of Liquidated Damages as liquidated damages* for every working day's delay in finishing the work in excess of the number of working days prescribed; and the Contractor hereby agrees that said sum shall be deducted from any monies due the Contractor under this Agreement or if no money is due the Contractor, the Contractor hereby agrees to pay to the Owner as liquidated damages, and not by way of penalty, such total sum as shall be due for such delay, computed aforesaid.

[Italics supplied.]  Schedule C to the Contract provides as follows:

## SCHEDULE C
## SCHEDULE OF LIQUIDATED DAMAGES

Liquidated damages will be assessed at the rate of $ N/A  per day against Contractor for failing to the Substantial Completion Date or the following Construction Milestones.

[LIST    APPLICABLE    MILESTONES    AND    SUBSTANTIAL COMPLETION DATE]

*The parties specifically agree* that damages for delay are difficult to determine at the date of this Contract, *that the Liquidated damages provided for herein are in lieu of actual damages*, are meant to be compensatory and do not constitute a penalty.

[Italics supplied.]

There was some question as to what was intended by the insertion of "N/A" after the $ sign. Three witnesses testified regarding this question. Patricia Buck was the Church's construction contract administrator, and she personally negotiated the Contract with New Market on behalf of the Church. In her negotiations she dealt with Michael Melkersen, who at that time was a vice president and in-house counsel to New Market. Mr. Melkersen testified that it was important to New Market for the contractual playing field to be level, and because the Contract barred New Market from charging delay damages to the Church, he wanted the Church to be similarly barred from charging delay damages to New Market. Ms. Buck testified that she inserted "N/A" into Schedule C as a result of her negotiations with Mr. Melkersen. On cross-examination, Ms. Buck testified that delay damages were a "fear factor – especially for small contractors like New Market," and by inserting "N/A" into Schedule C, "the idea was to have the 'fear factor' taken

away for New Market." Mr. Melkersen testified that "N/A" meant "not any." Mr. Overbey was the Church's project manager and Ms. Buck's direct superior. He reviewed the construction contracts negotiated and prepared by Ms. Buck before they were presented to John Terry, the Church's Elder Head of Deacons' Council, for signature. Mr. Overbey testified that, "to me, 'N/A' meant 'no dollars'." Mr. Overbey's testimony was thus consistent with Mr. Melkersen's testimony. The Arbitrator finds that in the context of Schedule A, "N/A" means "not any." [15]

The Church argues that in the absence of liquidated damages, the Church is entitled to recover actual damages. For two reasons, this argument fails. First, and significantly, the parties did not strike Schedule C, or even the liquidated damages provision of Schedule C, from the Contract. Instead, the parties left Schedule C, including the liquidated damages provision, in the Contract, and they consciously provided that for each day of delay New Market would be charged "not any" dollars. Second, Schedule C directly contradicts the Church's argument, as it states, "… the Liquidated damages provided for herein *are in lieu of actual damages*." Thus, Schedule C prohibits the Church's recovery of actual damages for delay. As Schedule C was specifically negotiated between the parties, it governs their rights with respect to damages for delay.

The Arbitrator finds that the parties intended that the Church would not charge New Market for delay. Thus, the Church's delay claim against New Market is denied.

In any Event, the Evidence Does Not Support the Church's Delay Claim.   Even if the Contract had permitted the Church to recover actual damages, the Arbitrator finds that the Church failed to prove that New Market was the sole cause of any critical path delay or that New Market was otherwise liable for delay damages or responsible for delaying the Project completion, and so the Church's delay claim would be denied on this basis as well. There are many reasons for this finding, but only some of them will be discussed below.

The convincing evidence was that the Church's project management, administration, planning, control and scheduling for this Project were very poor. The Church was acting as its own general contractor, but its in-house construction team was under-experienced and under-qualified to manage this $50 million project. The Church's design consultants provided little support. The design documents were of poor quality, and they were in a constant state of flux. Frequent design revisions were issued throughout the Project, sometimes on a large scale and often without clouding or calling out the revisions, making it difficult for the contractors to determine what had changed. At least 15 different sets of electrical drawings alone were issued, resulting in almost $3 million in change orders. Responses to contractors' requests for information were slow in coming. Both the Architect (HH Architects) and the Engineer (Datum Engineering, Inc.) were remotely located, in Texas, and the local liaison architectural firm (Cedar Architects) went out of business part way into the Project. Greg Diana, the Datum engineer assigned to design and administer the Project, was inexperienced, being just a few years out of university, and he did not sit for his professional engineer's license exam until 2007. An as-planned baseline schedule (known as the "Conserv schedule") was prepared by Conserv, Inc. for the Church at the

[15] Anthony R. Manning was New Market's CPM scheduling and delay analysis consultant. On cross examination he was handed a blank paper with "N/A" handwritten on it by opposing counsel and asked, "What does this mean to you?" Mr. Manning testified "not applicable." Mr. Manning's testimony was not given in the context of Contract Schedule C, and the Arbitrator does not take it as such.

start of the Project in 2004, showing a start date of February 16, 2004 and a finish date of July 6, 2006.[16]   However, this schedule was <u>only updated one time</u>, a year later on March 10, 2005.[17] Between March 10, 2005 and April 17, 2006 (when New Market's Contract was terminated), <u>the Conserve schedule was never updated</u>, which is contrary to specification section 01320, item 3.01-A, which requires the Church to update the schedule "[a]t monthly intervals."  Thus, the Church abandoned the Conserve schedule, and made absolutely no use of it as a management tool to schedule the work on the Project.  As a result of these factors, there was very poor coordination and control of the many contractors working on the project, and the Project was in disarray and out of control, with contractors working without regard to the sequencing of the Conserve schedule.  The structural steel was half a year or more behind schedule by December 2005.[18]  At that time, the Church introduced an expansive 50' high scaffolding platform which was installed across the entire sanctuary where New Market's catwalk was being installed.  New Market and all other contractors were required to evacuate the sanctuary for a month while the scaffolding was being installed.  This scaffolding was never contemplated on the Conserve schedule.  The introduction of this scaffolding completely changed the means methods, manner and sequence of all of the work being performed in the sanctuary.  The high work in the ceiling became the focus in the sanctuary, while access to the work on the ground level of the sanctuary was blocked by the scaffolding system.[19]

The Church's delay claim is based upon the schedule and delay analysis performed on behalf of the Church by Dale A. Fritz, P.E. Mr. Fritz' analysis completely ignored the Conserve baseline schedule.  It ignored the substantial delays and out of sequence work on the Project through early 2006, and their impact on New Market's work.  It accepted the impact of the scaffolding system as if it had been contemplated from day one.  Mr. Fritz made no effort to develop an as-built schedule from day one.  (With only one schedule update over a two-year period, developing an as-built schedule would have been a massive undertaking.)  Mr. Fritz' analysis was based in very large part on a brand new completion schedule created by Delta Consulting on May 22, 2006, after New Market was terminated, which schedule had a start date of May 6, 2006, also after New Market was terminated.[20]  Delta Consulting's scheduling was flawed in many respects, and

---

[16] There was no evidence that Concerv, Inc. was involved in the Project scheduling it had prepared the baseline Conserv schedule.  The evidence indicates that the lone March 10, 2005 update was prepared by the Church.

[17] This Conserv schedule was first provided by the Church to and received by New Market on February 23, 2005, long after the Contract date of May 28, 2004.  There was no evidence presented that the sole update to the Conserve schedule was provided to New Market.  Moreover, there was no evidence that the Conserve schedule was a Contact document to which New Market was bound; but even assuming that it was, the Church's delay claim would nevertheless be denied, as explained above.

[18] J. Mark Dungan, of Delta Consulting, also testified that Delta Consulting had assessed a 273 day delay to Globe Iron, the structural steel contractor, based on an analysis of the Coserv baseline schedule.

[19] In fact, the scaffolding prevented performance of other aspects of New Market's work at the ground level of the sanctuary until the scaffolding could be removed, which did not occur until late 2006 or early 2007.  On this basis alone, New Market would have been entitled to a time extension until scaffold removal.  Thus, as of the April 17, 2007 termination of New Market's Contract, New Market was excused from fully completing its contract work until the scaffolding was removed, and so even if the Contract had allowed the Church to charge New Market for delay, it is clear that New Market was not at fault for not completing all of its Contract work within the time (528 days) allowed by the Contract.  This 528 day duration is the only clearly articulated schedule in the Contract, and interim milestone dates are intentionally omitted from the Contract (see Schedule C to the Contract).

[20] Mr. Fritz attempts to characterize Delta Consulting's May 22, 2006 schedule as a "schedule update" to the baseline Conserve schedule.  It is not a "schedule update."  As explained herein, it is a brand new completion schedule with a new start date (May, 6, 2006) and an arbitrary completion date (February 16, 2007).  It contains no activities prior to May 6, 2006, and there is no way to tell the as-built status of the project prior to May 6, 2006.  The forward looking activities bear little if any relationship to the baseline Conserve schedule, and the stated purpose of

in any event the development of the Delta Consulting scheduling was not supported by any expert testimony from Delta Consulting.[21]  Both Delta Consulting's scheduling and Mr. Fritz' analysis are based on an assumption that New Market's catwalk work was delaying allegedly critical path framing work of C&C Builders in the high area of the sanctuary.  Apparently, neither Mr. Fritz nor Delta Consulting ever interviewed Floyd Whorton of C&C Builders, who personally supervised and managed C&C Builder's work onsite at the Project.  The Arbitrator believes the testimony of Mr. Wharton that C&C Builders was not delayed by the catwalk, other than a "couple days" C&C Builders could not work in a limited area near the lift while Cole Contracting[22] ("Cole") lifted its materials up onto the scaffolding, and a "minimal impact" in the transition period between New Market's termination and Cole's start up, and that C&C Builders was always able to "resequence, reorganize and keep the Project moving."  Mr. Wharton testified that the sanctuary ceiling area was vast, that C&C Builders had plenty of work to do throughout the ceiling, and that C&C Builders was able to productively "work around" not only the catwalk work, but also the many other trades working in the ceiling area above the scaffold.  Mr. Wharton testified that Cole had only a two-man crew that worked at only one spot on the catwalk at a time, and so Cole was not in the way of C&C Builders.  The Arbitrator further believes and accepts the testimony of Anthony R. Manning that a credible schedule analysis must be based upon, among other things, an agreed upon as-planned baseline schedule, periodic (ideally monthly) schedule updates, and a reliable as-built schedule.[23]  The Arbitrator finds that Mr. Fritz' analysis was not based on these things.  And there was no analysis of how the catwalk work, or the structural steel delays or any other delays or work for that matter, impacted the baseline Conserve schedule upon which New Market's schedule was based.

The Arbitrator further finds that Delta Consulting's scheduling, upon which Mr. Fritz' analysis is based, is a flawed and incomplete work in progress.  It was created after New Matket was terminated and bears little if any relationship to the baseline Conserve schedule upon which New Market's Contract was based.  In essence, Delta Consulting put on blinders, completely ignored what had occurred on the Project prior to New Market's termination, and Delta Consulting prepared no as-built schedule for the Project as a whole.[24]  Delta Consulting's scheduling also shows concurrent critical path delay on framing activities not in New Market's scope of work

---

Delta Consulting's scheduling effort was to help the Church bring the Project to an expeditious completion.  It is, plain and simple, a brand new schedule to which New Market was never obligated to adhere.

[21] The Church called no one from Delta Consulting as an expert witness.  During the discover phase of this arbitration, the Church elected to forego doing so in order to avoid producing Delta Consulting's analysis and work papers relating to scheduling, delays and other issues on the Project prior to the declaration of New Market default in March 2006.  The Church called J. Mark Dungan of Delta Consulting to testify as a fact witness, but his personal factual knowledge was very limited and his testimony was based extensively on hearsay, and so his testimony is given little weight by the Arbitrator.

[22] Cole Contracting was the Church's replacement contractor for New Market's catwalk work.  Cole Contracting was brand new company formed by an employee Williams Steel (the Church's structural steel erector) who had been working on the Project.

[23] Mr. Manning was New Market's expert witness and consultant in the area of CPM scheduling and delay analysis.  Mr. Manning obtained a bachelor of science degree in civil engineering from Syracuse University in 1980, and he has 28 years experience in the construction industry ranging from project manager to executive vice president for ENR top 50 contractors and regional GC/CM firms including McDevitt-Street-Bovis and Beers-Skanska.  He is currently the principal of Manning Construction Consulting, LLC.  Over those 28 years, he has had extensive experience with CPM scheduling, ranging from developing and implementing CPM schedules to delay analysis.

[24] This should come as no surprise, as Mr. Dungan testified Delta Consulting was not so much concerned with what had occurred on the Project, but was instead focused on "quickly drafting a game plan or schedule for expeditiously finishing the Project."

and not caused by New Market, which alone would constitute a complete defense to the Church's delay claim. Delta Consulting's scheduling contains anomalies and fails to take into account important information provided by the Church's construction team (such as the Church's summary entitled "Events to Take Place Before Scaffold Removal," NM Vol. 32, tab 22) which very likely would impact and alter the critical path shown on Delta Consulting's scheduling, which evidences many other activities, not related to New Market's work, which were impacting the sanctuary ceiling framing, and which evidences that the catwalk work did not hold up anything more than the work performed directly below the very limited area where the crew was working on a given day. Delta Consulting's May 22, 2006 schedule was based on the Church's arbitrary new Project completion goal of February/March 2007 (see for example narrative entitled "Project Fragnet of Sanctuary Scaffold removal of FBCG," NM Vol. 32, tab 25). However, as Delta Consulting gathered more data, its schedules generated in August/September 2006 showed a much later, and more realistic, completion date in June 2007. See also progress reports of August 29, 2006 and September 19, 2006, NM Vol. 32, tabs 20 and 21. The impact of that later, more realistic completion date on the critical path, as it relates to the catwalk, is unknown. Delta Consulting prepared many constantly changing schedule iterations leading up to the "final" May 22, 2006 version which was presented at a progress meeting that day, including iterations prepared that same day in the rush to be ready for the meeting. Delta Consulting's J. Mark Dungan testified that these prior iterations were a "work in progress." Mr. Dungan also admitted that "the May 22, 2006 schedule dates are simply placeholders until we get more data." The Arbitrator finds that the May 22, 2006 schedule was also an incomplete work in progress, as data collection was ongoing and the schedule continued to evolve for months thereafter until September 2006 when Delta Consulting ended its work and left the Church with a completion schedule to be used as a management tool to bring the project to conclusion. The Arbitrator also finds that the schedule and its critical path are not reliable because they were easily and subjectively manipulated by the stroke of a computer key which could alter subjective logic ties and durations, which was clearly taking place throughout May through September of 2006 as the schedule evolved and more data was gathered by Delta Consulting.

The Arbitrator finds that, in light of all of the foregoing, that the schedule analysis of Mr. Fritz is neither credible nor reliable, is not based upon a solid evidentiary foundation, and is not based on acceptable schedule/delay analysis methodology. Accordingly, it is not accepted by the Arbitrator.

## New Market's Count I Breach of Contract Claim

New Market's breach of contract claim is denied. As explained above, New Market was in breach and default of the Contract, and the Church rightfully and properly terminated the Contract for default. In calculating the Church's damages for the default termination, New Market has been given credit for all amounts to which it is entitled under the Contract. As explained above, the Church's total completion costs exceed the adjusted contract balance remaining. Accordingly, New Market is not entitled to recover anything from the Church under the Contract. On the contrary, New Market is indebted to the Church.[25]

---

[25] New Market includes a claim for interest. However, no interest is due because New Market is entitled to no recovery from the Church.

New Market also argues that the Church breached the contract, including the implied covenants of good faith and fair dealing, by withholding payment of New Market's March 24, 2006 Application for Payment No.14 in the amount of $67,017 without timely notifying New Market of its intent to do so. However, the Arbitrator finds that the Church's March 27, 2006 notice of default constituted timely notice to New Market of the possibility that New Market would be charged all costs incurred by the Church in the event New Market did not cure the default by correcting all of the deficient catwalk work. (See FB Vol. 2, Tab 31.) A reasonable inference to be drawn from this default notice is that the Church would offset those charges against any monies due to New Market under Application for Payment No.14, and any future Application for Payment. Thus, the Church did not breach the contract in this regard. If anything, New Market breached the implied covenants of good faith and fair dealing by billing the catwalk out at 99% complete in March (and in February) of 2006 when in fact the catwalk required substantial corrective work and was far from 99% complete. Moreover, had the Church paid the $67,017 requested on Application for Payment No.14, then the contract balance remaining would have been $67,017 less and in turn the Church's damages for the default termination would have been $67,017 greater. Thus, the net effect on New Market ultimately would have been the same whether or not the $67,017 had been paid.

## New Market's Count II *Quantum Meruit* / Unjust Enrichment Claim

New Market's *quantum meruit* claim and unjust enrichment claim are denied. A valid contract exists between the parties regarding the subject matter of these claims, which precludes these claims. Moreover, as explained above, New Market was in breach and default of the Contract, and the Church rightfully and properly terminated the Contract for default. In calculating the Church's damages for the default termination, New Market has been given credit for all amounts to which it is entitled under the Contract and for its work on the Project, including all open change order and extra work requests. Still the Church's total completion costs exceed the adjusted contract balance remaining. The Church has not been unjustly enriched. On the contrary, the Church has been damaged. Accordingly, New Market is not entitled to recover anything from the Church.

## New Market's Count III Fraud Claim

New Market's fraud claim is denied. The Arbitrator finds no evidence of fraud on the part of the Church, and no evidence that the Church acted willfully or maliciously for the purpose of injuring New Market, no evidence that the Church conspired with anyone to commit a fraud upon New Market, and no evidence that New Market was injured or incurred any damages as a result of any act or omission on the part of the Church. The Arbitrator finds no evidence that the Church has participated in, or performed any acts in furtherance of, any conspiracy to perform any unlawful or tortuous act to injure or damage New Market, or to use unlawful or tortuous means to accomplish an act not in itself legal to injure or damage New Market. New Market's fraud count depends primarily, almost entirely, on its allegations that its Contract was wrongfully terminated, that the wrongful termination was done intentionally and with malice, that New Market was injured thereby, and that the Church and others profited from that termination and takeover of New Market's work. However, as explained above, New Market's Contract was terminated rightfully and properly for substantial and material breaches and default on the part of New Market. The Church, not New Market, was the injured party, and the Church certainly did

not profit from the termination.[26] New Market also alleges that the Church used New Market's employee Robert Grimes and New Market's equipment after hours to perform work (moving the north grand stairs) belonging to New Market. New Market admitted during the arbitration that this work was performed by Mr. Grimes after hours in his own free time, that this work was not New Market's contract work because New Market had installed this work properly, and that New Market would have required extra payment to perform this work. New Market received no change order for this extra work. Thus, the work did not belong to New Market, and the Church was free to have this work performed by others. Moreover, the Church did not use or convert any property of New Market. Whether Mr. Grimes did so was not proven by New Market. New Market also alleges that the Church tortiously interfered with New Market's contract, or employment relationship, with Mr. Grimes and solicited him to leave the employment of New Market. There is no evidence to support these allegations. The evidence is that Mr. Grimes became romantically involved with the Church's assistant project manager, Monica Grimes (formerly Buck)[27] on or about February of 2006; that New Market subsequently transferred Mr. Grimes away from the Church Project and onto another project; that New Market was becoming dissatisfied with Mr. Grimes; that Mr. Grimes was not happy about being separated from Ms. Grimes or with his deteriorating employment situation with New Market; and that he therefore ultimately decided to leave the employment of Mew Market for personal reasons, which he was free to do at any time. Finally, and as a completely independent basis for denying New Market's fraud claim, substantially all of the evidence submitted by New Market in support of its fraud claim was based on hearsay, and New Market relies heavily upon this hearsay evidence. The Arbitrator gives no weight to hearsay evidence to the extent it is used to prove fraud.

### New Market's Count IV Intentional Copyright Infringement Claim

New Market's claim for copyright infringement is denied. The Contract, at paragraph 15.1, provides that all works developed and prepared by New Market, to include shop drawings, are the sole property of the Church, and all right, title and interest therein shall vest in the Church upon full payment for such items in accordance with the agreed-to Schedule of Values. The Schedule of Values contains no separate line item for shop drawings, but New Market contends that the Schedule of Values allocates 12% of each line item for shop drawings. New Market contends that it has not been paid 12%, or the appropriate lesser amount, of each line item for which it has prepared complete or partial shop drawings, and that the Church thus has no ownership interest in the shop drawings and no right to use or publish the shop drawings. New Market contends that the Church has published or used New Market's shop drawings in violation of The Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*, entitling New Market to $150,000 for each set of shop drawings for which it has not been paid. Based on the Church's proper and rightful termination for default, the Church is entitled to offset its own damages against the contract balance remaining at the time of termination. The contract balance remaining at the time of termination includes all amounts earned by New Market but unpaid, as well as all amounts not yet earned by New Market. The Church's damages exceed the contract balance remaining. Accordingly, all amounts earned but unpaid at the time of termination (including any amounts earned but not paid for shop drawings) have been offset by the Church's damages. New Market is due to be paid nothing further for its work on the Project. On the

---

[26] Whether the Church's replacement contractors, for correction and completion of New Market's work after the termination, made a profit was not proven. But if they did profit, they were certainly entitled to do so. Contractors are in business to make a profit.

[27] Ultimately Mr. Grimes Mr. Grimes (formerly Buck) became married.

contrary, New Market is indebted to the Church. New Market has been paid in full for all of the shop drawings provided by New Market, by virtue of payments received from the Church and of offsets which the Church was entitled to make against the amounts earned by New Market under the Contract. The Arbitrator finds that sole ownership of all works developed and prepared by New Market on the Project, including all shop drawings, and all right, title and interest therein, are vested in the Church under the terms of the Contract.

## New Market's Count V Civil Conspiracy Claim

New Market's claim for civil conspiracy is denied. The Arbitrator finds no evidence that the Church has participated in, or performed any acts in furtherance of, any conspiracy to perform any unlawful or tortuous act to injure or damage New Market, or to use unlawful or tortuous means to accomplish an act not in itself legal to injure or damage New Market. Moreover, the Arbitrator finds no evidence to support the actual doing of any underlying unlawful or tortuous acts against New Market, including but not limited to any wrongful termination of the Contract, tortuous interference by Mr. Grimes, or by anyone else, with the Contract between New Market and the Church or with any other New Market contract, breach of fiduciary duty and loyalty of Mr. Grimes to New Market, conversion, any fraudulent act alleged by New Market in Count III, and/or any copy right infringement alleged by New Market in Count IV. The Arbitrator further finds no evidence that the Church has participated in, or performed any acts in furtherance of, any conspiracy for the purpose of performing any willful and/or malicious act against New Market.

New Market's claim includes an allegation that the Church has violated VA. CODE ANN. §18.2-499(A) entitling New Market to damages as provided under VA. CODE ANN. §18.2-500(A). The parties Contract, however, provides that the laws of the state of Maryland shall apply, and so New Market's claim is further denied to the extent it is based on Virginia law. Be that as it may, the Arbitrator finds that New Market failed to prove that the Church, Mr. Grimes and/or Monica Grimes (formerly Buck), or anyone else violated VA. CODE ANN. §18.2-499(A) and that New Market is not entitled to recover any of the damages provided under VA. CODE ANN. §18.2-500(A).

Finally, and as a completely independent basis for denying New Market's civil conspiracy claim, substantially all of the evidence submitted by New Market in support of its civil conspiracy claim was based on hearsay, and New Market relies heavily upon this hearsay evidence. The Arbitrator gives no weight to hearsay evidence to the extent it is used to prove civil conspiracy.

## Expenses and Costs, Including Attorneys' Fees, of the Arbitration

The Church seeks to recover $771,313 for its costs and expenses, including attorneys' fees, incurred in connection with the arbitration. New Market seeks to recover $443,944 for its costs and expenses, including attorneys' fees, incurred in connection with the arbitration. Both parties base their claims on Contract paragraph 20.1, which provides that the "prevailing party" shall be entitled to collect such costs and expenses from the other party. The rules of the American Arbitration Association, Construction Industry Arbitration Rules, provide that the Arbitrator "may" include an award of attorneys' fees if all parties have requested such an award or it is authorized by law or contract. The Arbitrator considers neither party to be the prevailing party. The Church's claim in the arbitration was $1,287,062, before considering expenses, costs and

attorneys' fees.  The Church was found above to be entitled to recover $130,518 on this claim, while $1,156,544, or roughly 90%, of the Church's claim was denied.  Thus, the Church cannot be considered the prevailing party.  New Market's claim in the arbitration was $487,367, before considering expenses, costs and attorneys' fees.  New Market was found above to be entitled to recover nothing on this claim.  Thus, New Market cannot be considered the prevailing party. Accordingly, the Arbitrator denies the Church's claim of $771,313 for its costs and expenses, including attorneys' fees, incurred in connection with the arbitration, and the Arbitrator denies the New Market's claim of $443,944 for its costs and expenses, including attorneys' fees, incurred in connection with the arbitration

### Summary

In summary, The First Baptist Church of Glenarden is entitled to recover from New Market MetalCraft, Inc. $130,518 as damages arising out of New Market's default under the Contract and the termination of the Contract.  The fees and expenses of the arbitrator shall be borne in equal shares by the parties.  Each party shall bear its own expenses and costs, including attorneys' fees, incurred in connection with the arbitration.

**For the foregoing reasons, I award as follows:**

1.      **New Market MetalCraft, Inc. shall pay to The First Baptist Church of Glenarden the sum of One Hundred Thirty Thousand Five Hundred Eighteen Dollars ($130,518.00).**

2.      **The fees and expenses of the arbitrator shall be borne in equal shares by the parties.  No adjustment to the award is required or made in this regard.**

3.      **The above sum is to be paid on or before thirty (30) days after the date of this Award.  Post-award interest of six percent (6%) per annum shall begin to accrue thirty (30) days after the date of this Award if payment is not made by then.**

4.      **This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims and counterclaims not expressly granted herein are hereby denied.**

**Dated this 1st day of February, 2010**

Kenneth K. Sorteberg, Esquire
Arbitrator
Huddles Jones Sorteberg & Dachille P.C.
10211 Wincopin Circle,  Suite 200
Columbia, MD  21044
410-720-0072
sorteberg@constructionlaw.com